## FIREMEN'S MUTUAL INSURANCE COMPANY v. HIGH POINT SPRINKLER COMPANY.

(Filed 14 January, 1966.)

**1. Insurance § 96.1—**

Insurer in a property damage policy, upon paying a claim thereunder, is subrogated, both under standard statutory policy and under the common law, to the rights of insured against the third person tort-feasor causing the loss. G.S. 58-176.

**2. Engineering § 2—**

One who engages in a business, occupation or profession represents to those who deal with him in that capacity that he possesses the knowledge, skill and ability, with reference to matters relating to such calling, which others engaged therein ordinarily possess, and represents that he will exercise reasonable care in the use of his skill and in the application of his knowledge and will exercise his best judgment in the performance of the work for which his services are engaged.

**3. Negligence § 1—**

If a person undertakes an active course of conduct under circumstances from which an ordinary person may reasonably foresee injury to others if he does not use ordinary care and skill, the law imposes the duty upon him to use ordinary care and skill to avoid such danger, and he may be held liable for loss by any person to whom he owes the duty of such care.

**4. Same—**

Even though an action for negligence is distinct from one for breach of contract, where a party contracts to perform a certain act and injury is reasonably forseeable by a person of ordinary intelligence if the contract is not performed with ordinary care and skill, the contractor may be held liable for damages proximately caused by the failure to exercise such care and skill in the performance of the contract.

**5. Engineering § 2—**

The evidence tended to show that defendant, after inspection, contracted to change a sprinkler system in a building from a wet to a dry system, that one of the pipes of the system had a declination which prevented it from draining by gravity, and that defendant did not change its grade or insert an additional drain, so that during freezing weather ice formed in the pipe, bursting it and activating the system, which resulted in damage to goods stored in the building. *Held:* The evidence is sufficient to be submitted to the jury on the issue of defendant's negligence in the performance of the contract.

**6. Trial § 21—**

Upon motion for nonsuit, plaintiff's evidence must be taken as true and all reasonable inferences favorable to plaintiff must be drawn therefrom.

**7. Bill of Discovery § 2—**

Motion for order to inspect writings under G.S. 8-89 is addressed to the discretion of the trial court and the court's ruling thereon will not be disturbed in the absence of a showing of abuse of discretion.

APPEAL by plaintiff from *Gambill, J.,* 24 May 1965 Civil Session of GUILFORD.

Plaintiff, claiming to be subrogated to the rights of Alma Desk Company, sues for damages alleged to have been sustained by the Desk Company as a result of negligence by the defendant in performing its contract with the Desk Company for the conversion of a sprinkler system in a warehouse of the Desk Company from a wet system to a dry system.

The complaint alleges, in substance:

The plaintiff issued its policy of insurance to the Desk Company insuring it against loss from damage to property stored in the warehouse, due to fire or the discharge of water from the automatic sprinkler system. The defendant contracted with the Desk Company to convert the wet sprinkler system which was in the warehouse to a dry sprinkler system. The defendant was negligent in the performance of the contract, and failed to perform it, in that the defendant permitted water to remain in one of the pipes comprising the system, which water froze and burst the pipe. This set the sprinkler system in operation and substantial damage was done to desks stored in the building before the water could be cut off. The plaintiff paid the claim of the Desk Company under its policy and now sues to recover its loss of the defendant.

The answer admits the contract as alleged but denies all of these allegations of negligence and failure to perform.

At the end of the plaintiff's evidence the court granted the defendant's motion for judgment as of nonsuit. The plaintiff appeals, assigning as error the granting of such motion, numerous rulings by the court upon objections to the introduction of evidence and the denial of its motion to require the defendant to produce certain records.

The evidence material to the motion for judgment as of nonsuit, taken in the light most favorable to the plaintiff, may be summarized as follows:

The plaintiff issued its policy of insurance to the Desk Company, insuring it against damage to the contents of the warehouse by water, fire and other causes. On 15 December 1962, the sprinkler system in the building became activated and before it could be shut off a great quantity of water poured out upon a number of desks and other properties of the Desk Company stored in the warehouse, damaging them substantially. The plaintiff paid the claim of the Desk Company under the policy and, thereby, succeeded to any right of action which the Desk Company might have against the defendant on account of such loss.

The Desk Company purchased the warehouse in February 1962. At that time the building was equipped with a wet sprinkler system. In a wet system, water, at city pressure, remains at all times in all parts of the system and sprays out into the building through the various sprinkler heads when the system is activated by a fire or other cause. Because water remains in a wet system at all times, it is necessary, during cold weather, to heat a building containing such a system, so as to prevent the freezing and bursting of the pipes which would, of course, set the sprinkler system in operation.

Having no need otherwise to heat the building, the Desk Company determined to replace the wet sprinkler system with a dry sprinkler system and entered into negotiations with the defendant for that purpose. In a dry system, all water is removed from the system, which is then filled with air, compressed to a pressure which will keep closed the main valves at the point where the system connects with the water supply. When by fire, or other cause, a break or opening in the system occurs, the air escapes through the opening. This lowers the pressure and permits the main valve to open so as to bring water into the system, and out into the building through such opening or openings. In the case of a fire, such openings would be brought about at the sprinkler heads by the heat. A break or opening in a pipe of the sprinkler system from any other cause would have the same effect and would set the sprinkler system in operation, the water escaping through the break in the pipe.

An officer of the Desk Company called a representative of the defendant and told him that the Desk Company wanted the wet sprinkler system in the building converted to a dry sprinkler system prior to cold weather and desired him to look at the building and give it a price for such work. The representative of the defendant went to the warehouse, looked at the existing system, telephoned the officer of the Desk Company, told him what was necessary to convert the system from wet to dry and thereupon wrote a letter to the Desk Company in which he said, "Following up our telephone conversation we proposed to do" thus and so, for which a price was quoted. This offer was accepted by the Desk Company and the defendant undertook to do the work.

No representative of the Desk Company went into the building with the representative of the defendant when he inspected the sprinkler system or while the conversion work was in progress. Being advised by the defendant that the work had been completed, the Desk Company did not turn on the heating system in the warehouse. Beginning with the night of 9 December and continuing into the afternoon of 15 December there was a period of intense and steady cold weather, the "free air" temperature at the Weather

Bureau Station dropping to 1 degree above zero on 13 December. In the afternoon of 15 December the weather moderated and the temperature rose to several degrees above the freezing point.

On the afternoon of 15 December the sprinkler system in the warehouse was set in operation and water poured out of a split or hole in one of the pipes. No one was then in the building. The activation of the sprinkler system caused an alarm bell to go into operation and in due time the situation was discovered and the sprinkler system was cut off.

There was no evidence of any fire in the building, or of any other cause of the activation of the sprinkler system except the break in the pipe. The break occurred in an elbow at the far end of a short length of pipe leading from one of the main lines of the system to a sprinkler head, and in the sprinkler head itself. This length of pipe sloped downward from the main line. Thus when the system was drained, the water in this pipe and in the elbow joint to which the sprinkler head was connected at the end furtherest removed from the main line, would not drain. The splits or breaks in the sprinkler head and in the elbow joint to which the sprinkler head was connected were due to the freezing of the water which remained therein when the entire system was supposedly drained in the conversion to a dry sprinkler system. With the freezing, and consequent expansion of this water and the ice into which it was converted, the pipe broke. With the subsequent moderation of the temperature on the afternoon of 15 December, the ice melted so that the compressed air in the system escaped through the holes in the pipe, the main valve of the sprinkler system was opened and the water rushed in and out through the holes into the building.

No other break occurred in the system. To have corrected the grade of the pipe in question, or put a drain at the end of it, as was done after the loss occurred, was a simple and inexpensive operation. It was apparent to the eye that the outer end of the line which broke was lower than the main into which it should have drained.

In the letter written by the defendant to the Desk Company, containing its proposal, nothing specific was said about regrading the existing lines of the sprinkler system. It was, of course, not contemplated that these lines would be replaced generally, but only that such work would be done as was necessary to convert the existing system to a dry system.

When the Desk Company requested the defendant to make the conversion, it did not give any instruction as to how the conversion was to be done but simply instructed that the system was to be con-

verted and a price quoted for the work. At that time the officer of the Desk Company who negotiated with the defendant did not know of this low point in the sprinkler system line. The defendant's representative did not inform the Desk Company's official of the existence of the low point in the line.

The representative of the defendant who made the inspection and quoted the price was called by the plaintiff as an adverse witness. He testified:

> "As to whether Mr. Wiley [the official of the Desk Company] told me that he wanted to convert a wet sprinkler system in the building, known as the Guilford Building, to a dry system, sir, I don't remember the conversation. That is the job we did, yes. * * * As to whether all that I remember is that he asked us to convert the wet system to a dry system, I don't recall that, sir, but apparently that's what it was."

He went to the building and walked over the entire sprinkler system, looking at all the pipes, including the branch lines. He was inspecting for low points. He further testified:

> "If I had found a low point in August, 1962, when I made an inspection I feel that I would have called it to Mr. Wiley's attention, yes sir. * * * As to whether I would not have suggested that something had to be done about it in order for it to be a satisfactory dry fire sprinkler system, I feel that I would have, sir. I would have done that because that was part of my duties, yes sir. I don't recall finding a low point in the line, sir."

The pipe in question was supported by a hanger suspended from the ceiling. No change in this hanger was made from the time the Desk Company purchased the building until after this loss occurred.

Representatives of other companies engaged in this business testified that in such conversion they habitually inspect the system to see that all pipes drain toward the main drain valve, the custom in the industry being to regrade pipes which do not so drain or to install separate drains in those pipes.

The foreman of the defendant's construction crew which performed this work was also called as an adverse witness for the plaintiff and testified:

> "I undertook to drain the system. I opened the drain valve. * * * I let the water run out of its own force, by force of gravity. I did not do anything else to get the water out of the

system. * * * I had nothing on my list or my blueprint about checking the system for low points. * * * I went on the third floor, on the northwest corner of the building. When I went up there I saw what appeared to be a low point."

This was the point at which the break occurred. This witness also testified:

"If I had seen a low point in the system * * * when I was doing the work out there, a low point which was not indicated on my plans and one which I could tell would retain water, I would have told my superior about that low point. I would consider that a part of my duties to my company. I wouldn't just ignore it. This is true because it is a custom of the industry. I would have told my superior about the low point so that they might * * * have something done about it for the reason that we have been discussing, holding water or not allowing it to drain. * * * because it could freeze. That is one of the reasons I would have told my superiors about it. I knew that if it would freeze it likely would split the pipe open. * * * I would have seen to it that someone knew of this condition."

*Smith, Moore, Smith, Schell & Hunter; by Richmond G. Bernhardt, Jr., for plaintiff appellant.*

*Jordan, Wright, Henson & Nichols; by G. Marlin Evans for defendant appellee.*

LAKE, J. The policy issued by the plaintiff to the Desk Company was in the standard form prescribed by the statute. G.S. 58-176. It provided: "*Subrogation.* This Company may require from the insured an assignment of all right of recovery against any party for loss to the extent that payment therefor is made by this Company." Both by virtue of this provision in the policy and upon equitable principles the plaintiff, having paid the loss to the Desk Company pursuant to the policy, is subrogated to the right of the Desk Company, if any, against the defendant. *Casualty Co. v. Oil Co.*, 265 N.C. 121, 143 S.E. 2d 279; *Insurance Co. v. Faulkner*, 259 N.C. 317, 130 S.E. 2d 645; *Winkler v. Amusement Co.*, 238 N.C. 589, 79 S.E. 2d 185; *Powell v. Water Co.*, 171 N.C. 290, 88 S.E. 426. The plaintiff offered evidence, which is uncontradicted, to the effect that it paid the full amount of the loss to the Desk Company. This evidence being taken as true in passing upon the motion for judgment as of nonsuit, the plaintiff now has the same right against the defendant which the Desk Company had immediately prior to such payment.

One who engages in a business, occupation or profession represents to those who deal with him in that capacity that he possesses the knowledge, skill and ability, with reference to matters relating to such calling, which others engaged therein ordinarily possess. He also represents that he will exercise reasonable care in the use of his skill and in the application of his knowledge and will exercise his best judgment in the performance of work for which his services are engaged, within the limits of such calling. *Service Co. v. Sales Co.,* 261 N.C. 660, 136 S.E. 2d 56 (industrial designer); *Hunt v. Bradshaw,* 242 N.C. 517, 88 S.E. 2d 762 (physician); *Jackson v. Central Torpedo Co.,* 117 Okla. 245, 246 P. 426, 46 A.L.R. 338 (oil well digger); *Flint Mfg. Co. v. Beckett,* 167 Ind. 491, 79 N.E. 503 (carpenter). It is alleged in the complaint and admitted in the answer that the defendant, at the time in question, was engaged in the business of installing fire sprinkler systems and held itself out to the public as qualified, competent and experienced in the installation of both wet and dry fire sprinkler systems.

This Court has said on numerous occasions, "The law imposes upon every person who enters upon an active course of conduct the positive duty to exercise ordinary care to protect others from harm, and calls a violation of that duty negligence." *Council v. Dickerson's, Inc.,* 233 N.C. 472, 64 S.E. 2d 551. See also: *Toone v. Adams,* 262 N.C. 403, 137 S.E. 2d 132; *Williamson v. Clay,* 243 N.C. 337, 90 S.E. 2d 727.

In 38 Am. Jur., Negligence, § 14, it is said:

> "[T]he law imposes upon every person who undertakes the performance of an act which, it is apparent, if not done carefully, will be dangerous to other persons or the property of other persons, the duty to exercise his senses and intelligence to avoid injury, and he may be held accountable at law for an injury to person or to property which is directly attributable to a breach of such duty."

However, an action to recover damages for an injury to person or property may not be sustained on the theory that such injury was caused by the negligence of the defendant unless there existed, at the time and place where the injury occurred, a duty on the part of the defendant to exercise care for the protection of the plaintiff or his property. 38 Am. Jur., Negligence, § 12.

Whether there is a duty owed by one person to another to use care, and, if so, the degree of care required, depends upon the relationship of the parties one to the other. The mere relation of one human being to another imposes some duty upon each. "Every man is in general bound to use care and skill in his conduct wher-

ever the reasonably prudent person in his shoes would recognize unreasonable risk to others from failure to use such care." Harper & James, Torts, § 28.1. Other duties arise by reason of special business or economic relations between the parties. For example, under the common law, an employer owes to his employee affirmative duties of care for his safety which he does not owe to the public generally. The relation of physician and patient imposes upon the physician a duty of care for the protection of the patient from injury which he does not owe to others. A bailee of goods, by virtue of the bailment relation, owes a special duty to the bailor to use care for the safety of the goods. An architect, in the preparation of plans and drawings for the construction of a building, owes to the person employing him a duty, not only to use his own best judgment, but also to exercise the ability, skill and care customarily used by architects upon such projects. 5 Am. Jur. 2d, Architects, § 8; 5 C.J., Architects, § 24; Anno: 25 A.L.R. 2d 1085. A carpenter who contracts to repair a house is liable in damages if he performs the repair so unskillfully as to damage other portions of the structure. See: *Flint Mfg. Co. v. Beckett, supra; Jackson v. Central Torpedo Co., supra;* 38 Am. Jur., Negligence, § 20.

The duty to use due care, the breach of which gives rise to a tort action for negligence in favor of one injured thereby in his person or property, may arise out of a contract. A breach of a contract, nothing else appearing, does not give rise to an action in tort. 38 Am. Jur., Negligence, § 20. However, the making of the contract may give rise to a relationship between the parties out of which arises the duty of one party to use due care so as not to injure the person or property of the other. In that event, the failure to use such care resulting in injury to the person or property of the other party gives him a right of action in tort for such negligent injury. *Toone v. Adams, supra; Pinnix v. Toomey,* 242 N.C. 358, 87 S.E. 2d 893; *Service Co. v. Sales Co., supra; Casualty Co. v. Oil Co., supra;* 38 Am. Jur., Negligence, § 14.

However, a complete, binding contract between the parties is not a prerequisite to a duty to use due care in one's actions in connection with an economic relationship. 38 Am. Jur., Negligence, §§ 14, 17. Barnhill, C.J., said in *Honeycutt v. Bryan,* 240 N.C. 238, 81 S.E. 2d 653:

"Whenever one person is by circumstances placed in such a position towards another that anyone of ordinary sense who thinks will at once recognize that if he does not use ordinary care and skill in his own conduct with regard to those circumstances, he will cause danger of injury to the person or

property of the other, duty arises to use ordinary care and skill to avoid such danger."

The defendant was engaged in the automatic fire sprinkler business. Its regular business included conversion of wet sprinkler systems to dry sprinkler systems. The Desk Company had a wet sprinkler system in its warehouse and informed the defendant of its desire to convert this system to a dry sprinkler system. Taking the plaintiff's evidence to be true and considering it in the light most favorable to the plaintiff, as we are required to do in passing upon the correctness of the judgment of nonsuit, it shows that the Desk Company requested the defendant to examine the system and submit to the Desk Company a proposal of a price for doing the work necessary to convert it to a dry system. The defendant's representative walked through the building, observing the system, unaccompanied by any representative of the Desk Company. One purpose of this inspection was to look for low points. Had he observed one, it would have been his duty to suggest that something be done about it because of the danger that if water was left in such a low point it might freeze and cause the pipe to break. Having completed his inspection, he submitted a proposal to the Desk Company specifying certain things to be done and stating a price for doing them. His proposal was accepted, and the specified things were done. In his inspection he did not find the low point, although it was obvious to an observer who looked at this particular length of pipe. There is nothing to indicate that the Desk Company knew the pipe in question was so connected that it would not drain. Since no other pipe in the system broke, it may reasonably be inferred from the plaintiff's evidence that there were no other low points in the system. The elimination of the hazard caused by this particular low point was a relatively simple, inexpensive matter.

As was said by Moore, J., in *Service Co. v. Sales Co., supra:*

"When one undertakes a professional assignment, the engagement implies that he possesses the degree of professional learning, skill and ability which others of that profession ordinarily possess, he will exercise reasonable care in the use of his skill and application of his knowledge to the assignment undertaken, and will exercise his best judgment in the performance of the undertaking. * * * He may incur liability in tort by reason of negligent performance."

When one, engaged in the business of installing equipment, such as a sprinkler system, accepts an invitation to inspect an existing installation and submit a proposal for its conversion to one of a

different type, which he holds himself out as qualified to do, a relationship arises between him and the owner of the building such as to impose upon him the duty to use, in inspection of the property and the preparation of the specifications for the conversion work, that degree of care which is customarily used upon such assignments by others engaged in such business. In such a situation, knowing that the owner is relying upon him to determine what is necessary to do to the existing system in order to convert it into the system desired, if he, by failure to use due care, omits from his specifications an alteration necessary to avoid danger of damage to the owner's building or other property, he is not absolved from liability for such damage by the fact that the owner accepts his proposal for less than adequate changes in the existing system, the owner being unaware of the condition which makes the proposal inadequate. The duty to use due care to include within the specifications all that is necessary to make the converted system safe continues into and through the performance of the work.

In reviewing the judgment of nonsuit, the plaintiff's evidence must be taken as true and all reasonable inferences favorable to the plaintiff must be drawn therefrom. *Coleman v. Colonial Stores, Inc.,* 259 N.C. 241, 130 S.E. 2d 338; *Ammons v. Britt,* 256 N.C. 248, 123 S.E. 2d 579. So considered, the evidence is sufficient to support a finding that the defendant failed to use due care in preparing its specifications of the changes necessary to be made for the conversion of the sprinkler system and that such negligence was the proximate cause of the damage to the property of the Desk Company for which the plaintiff had paid in accordance with its policy. That being true, the motion for judgment of nonsuit should not have been allowed. Upon retrial of the action it will, of course, be for the jury to determine, in the light of all the evidence then introduced, whether the defendant was, in fact, negligent.

The plaintiff's pre-trial motion for an order directing the defendant to permit the plaintiff to inspect its files relating to this matter was addressed to the discretion of the court. G.S. 8-89. *Dunlap v. Guaranty Co.,* 202 N.C. 651, 163 S.E. 750. There is no showing of abuse of this discretion in the denial of the motion.

It is not necessary that we now pass upon the exceptions relating to the admissibility of evidence, since those questions may not recur when the matter is tried again.

Reversed.